In the Matter of the VILLAGE OF BRONXVILLE, Appellant, against MILO R. MALTBIE et al., Constituting the Public Service Commission of the State of New York, Respondents.

Argued October 1, 1940; decided November 19, 1940.

*E. J. Dimock, Barent L. Visscher, A. S. Davis, Jr.,* and *Arnold Frye* for appellant.

208

*Gay H. Brown* and *Raymond J. McVeigh* for respondents.

FINCH, J. This appeal raises the question as to the extent of the power of an incorporated village, under the Transportation Corporations Law (Cons. Laws, ch. 63) and Public Service Law (Cons. Laws, ch. 48) of this State, to refuse consent to the establishment of intermunicipal omnibus service through such village.

Appellant village is essentially a high class metropolitan suburb and residential community, located in Westchester county about six miles above the New York city line. On the south, Bronxville is bounded by the city of Mount Vernon; to the east, beyond a small part of Eastchester and North Pelham, lies the city of New Rochelle; and but three hundred yards west of the Bronxville station is the Yonkers city line. Each of these cities contains a substantial population and a trading center. Bronxville, however, is almost a self-contained community, lacking, perhaps, only the large general department stores. By now its population closely approaches 9,000, not including its large dependent development just over the Yonkers line which regards itself as part of Bronxville for all purposes (*e. g.*, post office, shopping, amusements, churches, clubs, etc.) except the payment of taxes and the receipt of municipal services (*e. g.*, schools, fire and police protection, etc.). The main center of this village is located on its western side, the hub being the station of the Harlem Division line of the New York Central Railroad. In 1937 the Yonkers Bus Company was granted a certificate of public convenience and necessity by the Public Service Commission over the objection of the village authorities to extend its route from Yonkers into the village to the west side of the station. Thereafter the bus company

sought to establish the route in question from this eastern terminus at the Bronxville station, through the underpass, easterly on Pondfield road through Eastchester (the town in which the village of Bronxville is located but outside of the village limits); thence through North Pelham and finally to the New York, New Haven and Hartford Railroad station in the city of New Rochelle. The return trip would follow the same route. Again the village authorities refused consent and application was made by the bus company to the Public Service Commission for a further certificate in spite of such refusal. Hearings were held at which numerous interested parties and groups appeared and testified. An amendment to the prior certificate was granted by a three to two vote of the Commission, the majority holding that the village had unreasonably withheld its consent to the proposed route. The bus line commenced operation and continued for some months. Application was made by the village for a rehearing. This was granted, but the original determination was adhered to. It is this determination which the village seeks to have reviewed under article 78 of the Civil Practice Act. Upon transfer to the Appellate Division, third judicial department, that court unanimously sustained the decision of the Public Service Commission. Leave to appeal was granted by this court.

In the consideration of this question the right of an omnibus corporation as a common carrier to establish its lines within a State is dependent upon an interpretation of the intention of the State Legislature as shown in the statutes. (*Matter of Dobosen* v. *Mescall*, 205 App. Div. 265; *Hadfield* v. *Lundin*, 98 Wash. 657 [1917]; *Matter of Dickey*, 76 W. Va. 576; *City of Memphis* v. *State ex rel. Ryals*, 133 Tenn. 83 [1915]; *Greene* v. *San Antonio*, 178 S. W. Rep. 6 [Tex. Civ. App.]; *Frick* v. *City of Gary*, 192 Ind. 76 [1922]; *Weksler* v. *Collins*, 317 Ill. 132 [1925]; 44 C. J., p. 1028, § 3870. Also see *People* v. *Rosenheimer*, 209 N. Y. 115.) Likewise it has been settled that this power of the Legislature may be delegated to the municipalities of the State. (*Matter of Dobosen* v. *Mescall*, *supra*; *Dallas* v. *Gill*, 199

S. W. Rep. 1144 [Tex. Civ. App. 1918]; *Cummins* v. *Jones*, 79 Ore. 276 [1916]; *Jitney Bus Assn.* v. *City of Wilkes-Barre*, 256 Penn. St. 462 [1917]; *Melconian* v. *City of Grand Rapids*, 218 Mich. 397 [1922]; *Frick* v. *City of Gary, supra;* 44 C. J., p. 1028, § 3870.)

In so far as relevant, our Transportation Corporations Law since 1915 and 1919 has provided:

" § 66. Consent required. No stage, omnibus line, stage route, motor vehicle line or route, nor any vehicle in connection therewith, and no vehicle carrying passengers at a rate of fare of fifteen cents or less for each passenger within the limits of a city or in competition with another common carrier which is required by law to obtain the consent of the local authorities of such city to operate over the streets thereof shall be operated wholly or partly upon or along any street, avenue or public place in any city, nor shall a certificate of public convenience and necessity be issued therefor, until the owner or owners thereof shall have procured, after public notice and a hearing, the consent of the local authorities of such city, as defined by the railroad law, to such operation, upon such terms and conditions as said local authorities may prescribe. * * *

" § 67. Application of preceding section to towns and villages. The town board of any town or the board of trustees of any village may adopt a resolution providing that the provisions of the preceding section shall apply to such town or village, and thereafter no stages, omnibus or motor vehicle line or route shall be operated, wholly or partly, upon or along any street or highway in such town or village, nor shall a certificate of public convenience and necessity be issued therefor, until the owner or owners thereof shall have procured the consent of the local authorities of such town or village, in the same manner and subject to the same terms and conditions as is provided in the preceding section for procuring the consent of the local authorities of a city; and for such purpose the town board of a town and the board of trustees of a village shall be deemed the local authorities." (Formerly § 26.)

A reading of the above sections shows that no omnibus corporation could operate upon the streets of a municipality until the corporation had secured the consent of the local authorities, and prior to the foregoing provisions, a certificate of convenience and necessity could not be issued to an omnibus corporation without the consent of the local municipality whether it was a city, town or village. In 1931 the Public Service Law had added to it the following sections (Laws of 1931, ch. 531):

" § 63-d. Franchises and privileges. 1. No omnibus corporation shall operate an omnibus line without first having obtained the permission and approval of the commission having jurisdiction and its certificate of public convenience and necessity, after a hearing had upon notice. * * *

" 2. Except as otherwise provided in section sixty-three-e, no such certificate of public convenience and necessity shall be issued until there be filed in the office of the commission by the applicant therefor a verified statement showing that the required consent of the proper city or other municipal authorities has been obtained as required by the transportation corporations law. * * *

" § 63-e. Omnibus corporations operating through or into two or more municipalities; powers of commission.

" 1. Notwithstanding any inconsistent general or special statute, the commission shall have power to issue a certificate of public convenience and necessity to any omnibus corporation proposing to operate through or into two or more cities, towns, and/or villages without the consent of local authorities of such towns or villages, if such consent is unreasonably refused or withheld, or if unjust or unreasonable conditions are attached to the granting of any such local consent, and may modify any such conditions, or attach new conditions as it shall determine to be just and reasonable. * * *

" 3. In any proceeding before the commission for a certificate of convenience and necessity without the consent of local authorities of towns or villages, such local authorities

shall file with the commission within thirty days from the date of notice a certified statement setting forth the reasons for not granting such consent, or for withholding consent or for attaching conditions to the granting thereof. The commission shall consider such reasons in its determination of whether the local consent was unreasonably refused or withheld or whether the conditions attached thereto were unjust or unreasonable. If such local authorities shall not file said certified statement as herein required, they may not thereafter question such determination of the commission."

As a result of the addition of the last two provisions above quoted, power within prescribed limits was conferred upon the Public Service Commission to override the wishes of the village. The question here involved concerns the extent of such prescribed limits. In effect it has been held by a three to two vote of the Public Service Commission, and affirmed by the Appellate Division, that the power no longer resides in the village of Bronxville to exclude omnibuses under existing law, but instead, the desire of others for transportation may render futile the protests of this village. The conflict is between consideration for the wishes of a majority of the inhabitants of a village represented by the village trustees on the one hand, as opposed to the need and convenience of a portion of the traveling public.

In holding that those who have chosen to inhabit a *rus in urbe* may still possess the paramount right to prevent intrusion upon their quietude by an omnibus corporation, we are persuaded not only by the history of the enactments but also by internal evidence contained in the statute.

As already indicated, up to 1931, villages, towns and cities might refuse to permit omnibuses and trolley cars to use the streets of the municipality. In addition, the State Constitution makes secure the right of municipalities to refuse permission for the use of their streets by through trolley lines. (Art. III, § 17.) At the hearings held by the Commission appointed by the Legislature to study revision of the Public Service Law, there developed examples

of refusal which were based not upon the merits, but upon capricious and, in some cases, venal grounds; as, for example, where consent was refused unless the omnibus route was laid out past a remote farm of an influential member of the Board; or where, as a condition of granting consent, the omnibus corporation was required to pay the wages of an employee theretofore employed by the Chamber of Commerce; or where, for instance, the members of the village board were connected with a railroad company and had pressure brought upon them to vote against granting a consent to the omnibus corporation; or where, after consent had been refused, apparently without reason, the applicant was approached with the suggestion that consent could be acquired at a price; or even where consent was refused for the reason that a local official had had an unpleasant experience with an omnibus or its operator on the road. (Report of the Commission on Revision of the Public Service Commissions Law, Hearings, 1930, vol. 3, pp. 2053–2106.)

Following the submission of a report referring to these abuses, the Legislature enacted the additional sections to the Public Service Law. These examples throw some light upon the intent of the Legislature when it used the words "if such consent is unreasonably refused." We have first the right in the village to prevent the use of its streets; then the mischief occasioned by refusal based upon capricious and even venal reasons, and, lastly, the remedy of permitting the Public Service Commission to override such refusal where the consent is unreasonably refused.

In addition, there is the meaning of the statute as gathered from a study of the enactment as a whole. The structure of the statute indicates a legislative intent that the Public Service Commission should not, except, perhaps, in a case of extreme hardship not here passed upon, balance public convenience and necessity over against valid reasons of a village for its refusal. Used in its accustomed sense, ordinarily a determination of public convenience and necessity involves only the question whether the granting of the additional franchise sought will create ruinous

competition and public inconvenience. (See *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Public Service Com.,* 195 N. Y. 157, 166.) On the other hand, a determination of the issue of unreasonableness of a refusal by the village may embrace many different issues having nothing to do with competition and public convenience. By the wording of the statute, the issue of convenience and necessity and the issue of the unreasonableness of the refusal by the village are separated and submitted in accordance with the statute for separate determination by the Public Service Commission, as appears in section 63-e, subdivision 1, which provides: "the commission shall have power to issue a certificate of public convenience and necessity * * * without the consent of local authorities * * * if such consent is unreasonably refused * * *." Subdivision 3 then goes on to provide that the local authorities shall file with the Commission "a certified statement setting forth the reasons for not granting such consent * * *" and that the Commission "shall consider such reasons in its determination of whether the local consent was unreasonably refused * * *," and that if such local authorities do not file such statement, thereafter they may not "question such determination of the commission." Thus the statute declares in substance that the Commission may grant a certificate of public convenience and necessity without requiring the consent of the local authorities, if a determination is made, after due consideration of the reasons advanced by the local authorities for their refusal, that the consent *was* unreasonably refused. This wording of the statute commands the Public Service Commission to place itself in the situation of the village when it determined the issue of whether the reasons given were unreasonable. When the Commission has thus placed itself in the situation of the village in determining the validity of the reasons given it must consider whether the consent was refused unreasonably from the standpoint of the constituents of the trustees of the village. It is always the duty of local legislative bodies to consider the interest of their constituents. The

interest of others are protected by other local authorities and by the State. There may be instances where the trustees of the village, in acting for the best interests of their constituents, may consider the interests of a larger public. We are not passing upon a case where the interest of a larger public *heavily* outweighs the interest of the inhabitants of the village.

This construction of the statute is also fortified by a consideration of what the Legislature should have said if it had intended to grant the power to the Public Service Commission to overrule the wishes of the towns and villages of this State in connection with the use of their highways by omnibuses whenever the Public Service Commission determined that the interest of the traveling public was sufficient to override the wishes of the villages and towns and grant franchises for the use of their streets. If such was the intention of the Legislature would it not have said that the Commission could issue certificates of convenience and necessity in spite of the refusal of the trustees of the village? Or would it not have said that, in considering whether the refusal of the local authorities was unreasonable, the Public Service Commission could take into account public convenience and necessity? The Legislature, however, did none of these things, but instead directed the Public Service Commission to pass separately upon the issue of the unreasonableness of the refusal of the village viewed from the standpoint of local authorities of the towns and villages. Thus, no jurisdiction was given to the Public Service Commission to grant a certificate of convenience and necessity unless the refusal of the local authorities was unreasonable from the standpoint of their own constituents as represented by them.

Furthermore, in using the word " unreasonable," the Legislature has chosen a word of art well known to the law. For a long time the courts have been applying a test of unreasonableness to the legislative acts of municipalities. (*Village of Carthage* v. *Frederick*, 122 N. Y. 268; *Kruse* v. *Johnson*, [1898] 2 Q. B. D. 91, 99.) Municipal authorities

act with respect to a franchise in a legislative capacity. (*Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377.) In dealing with such legislative acts as the refusal of the franchise in the case at bar, judicial authorities consider such acts reasonable or unreasonable from the standpoint of the local governmental subdivision for which the local legislative body assumes to act. (*Mayor* v. *Dry Dock, E. B. & B. R. R. Co.*, 133 N. Y. 104.) As applied to the case at bar this means that the refusal shall be considered reasonable if there is any evidence to sustain the conclusion that the granting of the franchise would produce injury to the village.

In addition, in support of our interpretation of what the Legislature intended by the statutes in question, there appears no general legislative recognition of an interest in the traveling public paramount, as against the interest of a municipality. Certainly the prohibition incorporated into the Constitution of the State which prohibits the Legislature from adopting any law authorizing the construction of a street railway without the consent of the local authorities having control of the street (Const. art. III, § 17), looks, if anything, the other way. Thus, the village of Bronxville might, for no reason, exclude inter-municipal trolley lines and in so doing would be protected by the Constitution. So, too, under this very section of the Public Service Law which we are considering here, namely, section 63-e, a refusal of a permit for an omnibus by a city for the use of its streets, even if capricious and unreasonable, may not be set aside by the Public Service Commission. (See *Kittinger* v. *Buffalo Traction Co.*, *supra.*) These considerations tend to confirm the construction of the statutes at which we have arrived.

We are thus brought to a consideration of the reasons given by the village of Bronxville for its refusal to consent to the projected route. Such reasons were of five classes: (1) the resulting deterioration to the character of the village and the depreciation of realty values; (2) congestion of vehicular traffic; (3) increased vehicular traffic danger; (4) conflict with the regional plan proposals for the develop-

ment of cross county traffic; and (5) that there was no substantial service of public convenience and necessity. A consideration of the first three will be sufficient to show that the refusal was far from arbitrary or capricious.

The evidence adduced before the Public Service Commission shows Bronxville as a community where a majority of the inhabitants work in New York city. Commuting from residence to business office requires approximately two hours a day. This daily travel is undertaken in the vast majority of cases to enjoy in so far as possible, the surroundings of the country within convenient reach of a large city. The opposition of the village to the proposed omnibus route is occasioned principally by a sincere desire on the part of a large majority of the inhabitants and those dependent upon them for a living to have the village retain, so far as possible, its quasi-rural character. In so urging the village is backed up by its Chamber of Commerce and a large majority of its inhabitants. The operation of at least eight buses an hour over an already crowded main street, and the only through east and west street at the village center, and then on through a narrow winding road in the residential section, will tend materially to destroy the peace and quiet of the village and render it less desirable to the present type of inhabitant. All those influences which produce urbanization will be accelerated. Certainly those persons residing upon or near the road upon which the omnibuses travel must lose more peace and quiet. The lives of the children of all residents, on their way to the village school, located on Pondfield road, and while at play, are subjected to increased hazard. Traffic at the shopping and commuting center necessarily becomes more congested. Persons driving cars must compete on a narrow road with omnibuses weighing several tons. An effective blow is struck at realty values of all residences, and particularly those now in that large section of the road given over exclusively to such residences. No one can read the hearings before the Public Service Commission and doubt the sincerity of the great majority of objections urged by

residents of the village. It may be noted also that the absence of this particular bus service does not create an intolerable situation for the traveling public, since some form of public transportation is reasonably available. It is true that the proposed route may convenience, from a transportation standpoint, some persons living both within and without the village; but, as already noted, such a fact may not be permitted to outweigh a refusal of the village authorities based upon valid local grounds.

In the light of the above reasons the action of the village authorities was far from capricious and unreasonable.

The order of the Appellate Division should be reversed and the determination of the Public Service Commission, dated October 18, 1938, granting an amendment to a certificate of public convenience and necessity, should be annulled, without costs.

LEHMAN, Ch. J., RIPPEY, LEWIS and CONWAY, JJ., concur; LOUGHRAN and SEARS, JJ., dissent.

Ordered accordingly.